**CAL–FRUIT SUMA INTERNATIONAL, et al.**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE.**

**Civ. A. No. 87–1503.**

United States District Court,
E.D. Pennsylvania.

Oct. 11, 1988.

James Rodgers, Carl G. Roberts, Philadelphia, Pa., for plaintiffs.

Dennis Linder, Philadelphia, Pa., for defendants.

## MEMORANDUM AND ORDER

FULLAM, Chief Judge.

By cross-motions for summary judgment, the parties seek final resolution of plaintiffs' challenge of marketing regulations, embodied in Marketing Order 925, 7 C.F.R. Part 925 (1987), which affect their importation of Thompson Seedless grapes grown in Chile into the United States. As promulgated under the Agricultural Marketing Agreement Act, 7 U.S.C. §§ 601 *et seq.*, as amended, the Marketing Order regulates the flow of grapes into the United States market to insure stable prices and consistent supply during the domestic marketing season; when the Marketing Order is not in effect imports are unregulated. Plaintiffs primarily complain that the Marketing Order regulations are more stringently applied to imported grapes than to domestic grapes and that imported grapes are unnecessarily subject to regulation when no domestic grapes are available for marketing. In plaintiffs' view, both conditions violate requirements of the enabling legislation and recent treaty law, specifically the multilateral Agreement on Technical Barriers to Trade, codified at 19 U.S.C. §§ 2531 *et seq.*

Previously, by memorandum and order of April 17, 1987, and as further explained in a memorandum of June 30, 1987, I denied plaintiffs' motion for a preliminary injunction against application of the Marketing Order to them, finding that plaintiffs had shown little likelihood of success on the merits. In those memoranda, I determined that the challenged regulations were consistent with the relevant requirements of the Agricultural Marketing Agreement Act ("AMAA") and supported by the administrative record. As most of plaintiffs' arguments merit no more attention than that already given in my earlier memoranda, I limit discussion of the present motion to a review of my determination that the challenged regulations are consistent with the relevant requirements of the AMAA and consideration of whether the Agreement on Technical Barriers to Trade compels a different result.

The Agricultural Marketing Agreement Act was enacted in 1937 to protect the domestic agricultural industry from the deleterious effects of market swings. The Act authorizes the Secretary to formulate Marketing Orders for each of several designated crops. By quality, size, and maturity standards imposed through an inspection process, the Secretary regulates the flow of produce into the marketplace during the marketing season to ensure stable prices and consistent supply, 7 U.S.C. § 604. In 1952, Congress moved to prevent imports from thwarting the goals of the Act and provided that listed imports be subject to the same or comparable regulation as domestic product during the pendency of the relevant product's market season, 7 U.S.C. § 608e–1; otherwise imports go unregulated.

In 1982, Congress added table grapes to those imports to be regulated under the Act. The only domestic grapes subject to Market Order regulation are those produced in California's Coachella Desert Valley region, the earliest producing area in the United States. Grapes harvested later in the domestic season in northern California and Arizona are not regulated. Plaintiffs' Chilean grape shipments potentially come under regulation only in late April as the Chilean harvest season wanes and the domestic season waxes; plaintiffs' shipments end by May 1.

On March 20, 1987, the Secretary ruled that the Market Order 925 should take effect on April 20 in 1987 and subsequent years, 52 Fed.Reg. 8865. As the commencement date had been May 1 prior to the 1986 season and plaintiffs bring grapes into the United States up until that date but not after, the April 20 commencement date meant that the final ten days of plaintiffs' shipments would be regulated each year.[1] With the imposition of regulation, and the allegedly stricter application of the threshold standards to their grapes, plaintiffs complain that they are forced to forgo these last shipments rather than risk not passing the threshold standards, the consequences of that failure being costly.

Plaintiffs complain that their grapes are inspected under standards that are in application more stringent than those applied to domestic grapes. Both domestic and imported grapes are inspected under the same set of "shipping point" standards, 7 C.F.R. 51.885. The difference in regulation arises with the time and location of inspection. Domestic grapes are inspected shortly after harvest and just before shipment to markets in the United States. Imported grapes, on the other hand, are inspected at port of entry but also just before their shipment to United States markets. The difficulty for plaintiffs is that their grapes must undergo the travails of two weeks transport by refrigerated ship before arriving in the United States and are therefore less likely to pass inspection than the more recently harvested domestic grapes. This difficulty must be accepted by plaintiffs as a risk inherent in their enterprise, however, inasmuch as the law affords them no relief.

■ Plaintiffs insist that the present application of standards to their grapes is not comparable to that accorded domestic grapes and so violates the requirements of § 608e-1 of the AMAA, which requires that the regulations extended to imports be the same or comparable to domestic regulation. That section states:

"whenever a marketing order issued by the Secretary of Agriculture pursuant to section 608c of this title contains any terms or conditions regulating the grade, size, quality, or maturity of ... table grapes ... produced in the United States the importation into the United States of any such commodity ... during the period of time such order is in effect shall be prohibited unless *it complies with the grade, size, quality, and maturity provisions of such order or comparable restrictions promulgated herewith.*" (emphasis added)

In plaintiffs' view, to be comparable to domestic regulation their grapes should also be inspected just after harvest—in Chile—or inspected under the less stringent "delivery point" standards normally applied to assess product quality upon arrival at the final destination within the United States market, 7 C.F.R. 51.885. But, as I previously concluded, the challenged regulations are comparable with respect to the United States market, the only market relevant under the AMAA. The Secretary applies the threshold standards at the same point in time to both imported and domestic products, just prior to entry into the United States market. Further, the Congressional intent behind § 608e-1—that imports not thwart the goals of the AMAA—would not countenance the result sought by plaintiffs, which would allow imported grapes of lesser quality, albeit from the debilitations of travel, into the market to compete with

---

1. The Secretary first advanced the date from May 1 in 1986. In response, some of the plaintiffs involved here brought suit in Federal District Court in the District of Columbia, but voluntarily withdrew their suit after denial of their motion for preliminary injunction.

domestic grapes subjected to inspection under higher standards.

■ Plaintiffs also insist that the AMAA only allows for implementation of the Marketing Order when domestic grapes are available for marketing, that imported grapes should not be subject to regulation before May 1 since domestic grapes are generally not available before that date. Plaintiffs cite harvest data which show that domestic grapes did not become available for sale until mid-May in 1987 and had not been available before April 30, the date of first harvest in 1986, in previous years. In positing that the Marketing Order could only be applied during the "normal marketing season", plaintiffs misread the relevant statute. That statute, § 602(4), provides that the Secretary should:

> "establish and maintain such orderly marketing conditions for any agricultural product enumerated in section 608c(2) of this title as will provide, in the interests of producers and consumers, an orderly flow of the supply thereof to market throughout its normal marketing season to avoid unreasonable fluctuations in supplies and prices."

Rather than narrowly restricting the application of marketing orders to the "normal marketing season", as plaintiffs would interpret it, § 602(4) contemplates that marketing orders should be designed to embrace all conditions that will impact on price and supply fluctuations within the normal marketing season. The Secretary, foreseeing in the April 30 early harvest of 1986 a trend to earlier domestic seasons, set April 20 as the commencement date to prevent growers and handlers from rushing lower quality immature grapes to market before commencement of regulation to take advantage of the higher prices prevailing early in the domestic season. In that lower quality grapes tend to depress consumer appetites and demand for grapes, thereby affecting grape prices, the Secretary's decision to advance the commencement date to serve as buffer to such grapes was reasonable and well within the mandate provided by § 602(4). Plaintiffs' reliance on the harvest data for past years is itself undermined by the fact that harvest data necessarily manifest the preclusive effects of the Market Order which encourages growers and handlers to harvest their grapes later in the growing season, at maturity, rather than earlier when they could fail to pass inspection. Absent the Market Order, domestic grapes might well be available in greater quantities in late April and early May.

■ Anticipating the possibility that their interpretation of the AMAA would not prevail, plaintiffs assert that provisions of a recently enacted treaty should. Plaintiffs rely on the multilateral Agreement on Technical Barriers to Trade, codified at 19 U.S.C. §§ 2531 *et seq.* (enacted July 26, 1979), which, as applied to the United States, generally mandates that imports be accorded no less favorable treatment than that given domestic goods. Plaintiffs argue that if the challenged regulations are consistent with the requirements of the AMAA, the more recently enacted Agreement on Technical Barriers supersedes the AMAA and imposes a higher standard under which the challenged regulations should be invalidated. Plaintiffs correctly cite *Whitney v. Robertson,* 124 U.S. 190, 8 S.Ct. 456, 31 L.Ed. 386 (1888) for the principle that when a treaty conflicts with statutory law concerning an issue to which both apply, the most recently enacted authority should be given effect. Plaintiffs do not, however, secure the next necessary step in their argument. They fail to establish that the AMAA and the Agreement on Technical Barriers are incompatible with respect to the regulations imposed on their grapes. Without making any effort to logically support their position, plaintiffs merely reiterate their assertion that treatment of their grapes is not comparable to the treatment of domestic grapes.

The Agreement on Technical Barriers in principal part provides, in Section 2532, that:

> "No Federal agency may engage in any standards-related activity that creates *unnecessary obstacles* to the foreign commerce of the United States, including, but not limited to, standards-re-

lated activities that violate any of the following requirements:

(1) Non-discriminatory treatment. Each Federal agency shall ensure, in applying standards-related activities with respect to any imported product, that such product is treated *no less favorably* than are domestic or imported products including but not limited to, when applying tests or test methods, no less favorable treatment with respect to:

A. the acceptance of the product for testing in comparable situations;

B. the administration of the tests in comparable situations; and

.    .    .    .    .

E. the siting of testing facilities and selection of samples for testing." (emphasis added)

Section 2531 modifies the scope of the prohibition set down in § 2532, stating in pertinent part that:

"No standards-related activity of any private person, Federal agency, or State agency shall be deemed to constitute an unnecessary obstacle to the foreign commerce of the United States if the demonstrable purpose of the standards-related activity is to achieve a legitimate domestic objective including, but not limited to, the protection of legitimate health or safety, essential security, environmental, or consumer interests and if such activity does not operate to exclude imported products which fully meet the objectives of such activity."

By language of exclusion, Section 2531 sanctions those standards-related activities that serve valid domestic objectives and do not operate to exclude imports that meet those objectives. The Marketing Order regulations fully comply with these requirements.

By definition, as national legislation, the AMAA embodies domestic objectives that, assuming compliance with the Constitution, are legitimate under the law of the United States. The inspections of imports and domestic product under the AMAA are imposed "to the end that agricultural products may be marketed to their best advantage, that trading may be facilitated, and that consumers may be able to obtain the quality product they desire...." 7 U.S.C. § 1622(h). These objectives fall within the broad inclusive categories stated in § 2532 of the Agreement on Technical Barriers. Plaintiffs present no challenges to the legitimacy of the AMAA's objectives under the Constitution.[2] Nor do they offer any basis for a challenge to the legitimacy of the AMAA's objectives under international law.

Plaintiffs also do not and cannot contend that their grapes would "fully meet the objectives" of the AMAA absent the present Marketing Order. As I stated earlier, the result sought by plaintiffs would instead thwart the goals of the AMAA by allowing plaintiffs' grapes into the United States market at quality levels lower than that required of domestic grapes.

■ Even under the "no less favorable" treatment standard stated in § 2532, the Marketing Order is compliant. In essence, this section states the same standard set down in § 608e–1 of the AMAA. The principal thrust of plaintiffs' challenge to the Marketing Order has been to repeatedly make the bald assertion that the treatment accorded their grapes is not comparable to that accorded domestic grapes. Comparability must, however, depend on the frame of reference within which the comparisons are to be made. The result sought by plaintiffs—inspections in Chile—implies that they seek comparability within an international rather than a national frame of reference. With respect to national legislation and the regulation promulgated thereunder, the appropriate frame of reference is the nation, unless explicit provision is otherwise made. While a treaty represents an effort to achieve international consensus, in application it is essentially a con-

---

**2.** Plaintiffs do challenge the AMAA's allowance for substantial input from domestic growers and handlers of the product regulated in formulating Marketing Orders, asserting that the separation of powers established in the Constitution are violated thereby. These arguments were adequately addressed in my June 30, 1987 memorandum.

tract to whose provisions the signatory nations have agreed to conform their conduct within their individual spheres of sovereignty. Unless the treaty explicitly provides otherwise, the appropriate frame of reference is again the nation and each nation's compliance with the treaty within its sphere. For example, the Agreement could have but does not provide for the extra-national inspections sought by plaintiff here. Instead, the Agreement, by defining its prohibition of "unnecessary obstacles" through reference to valid national regulation, contemplates application of the treaty under a national frame of reference.

There is no basis for plaintiffs' challenge under either the AMAA or the Agreement on Technical Standards. Plaintiffs' motion for summary judgment will be denied and the governments' granted.